Good morning. May it please the Court, my name is Valerie Brown and I'm representing Petitioner Gabriel Clark-Aigner. There are two ways that Mr. Clark-Aigner's petition was timely filed in the ADPA. The first way is because the mailbox rule applies to his first filed petition. And the alternative, he met the statute of limitations under the ADPA because equitable totaling applies to filing a second petition. May I just ask you about your first issue? Absolutely. If we apply the mailbox rule to an assertion without any cooperation at all, aren't we just doing away with the statute of limitations? Anybody, any prisoner, and if one does it, you can bet everybody else will do it. So doesn't that just do away with the rule? I think that might have been the magistrate's concern because at the adventure hearing the only evidence before him was Mr. Clark-Aigner's testimony. Mr. Clark-Aigner's testimony and his previous filings in response to the order on statute of limitations met the burden of Rule 4C. He said, he put it in the prison mail system, he signed it, he proposed it to me. But he also said in some documents that he never filed a previous petition either. In his response to one of the questions on the second petition, on the form petition, he said, in response to, have you previously filed one, he checked no. He said no. And then when the court sent him the order a few days later, he filled it out and he said, I didn't file it, but I sent it to you. So he had some confusion, but I'm sorry. Quite a technical litigant, huh? Well... But doesn't the mailbox rule require some showing of, like, diligence in following up? In, if I'm saying that correctly, this court did say that you're entitled to the mailbox rule even if the document is never received, if you are diligent in following up. And in that case, the court also said that a 21-month wait for a response from the court was reasonably diligent. And here we have a 24-month delay between what the petitioner did and his follow-up. And if I could just finish answering your question very quickly, Judge Nelson, in Koch, the court said, if you have evidence, if you have testimonial evidence from a petitioner, the burden then shifts, and the Bureau of Prisons is free to contradict that evidence. In this case, at the adventure hearing, government put on no evidence. They didn't offer any evidence of the conditions of the mail system at the prison where he was when he filed the first time. They didn't offer any information about when a person is in an administrative segregation at that facility, whether they do in fact have access to legal mail or even access to a mailbox. They didn't in any way contradict any of the assertions that the court documented. Well, why would the burden be on the government in that case? In most cases, I mean, the government would have knowledge of what happens in prison. Do they keep track of it and so forth? But otherwise, you're just saying if a prisoner says, well, I really did it. I really filed it. There's no record in the prison. There's no record anyplace. And that's what happened in Koch. The prisoner said, I did this. And in that case, there was a second declaration from another inmate who had had some involvement in the preparation of the petition. So there's two inmate affidavits in that case, but that's all there was. And the court said the burden now shifts. And in a lot of other cases, like Bryant, which is a 2007 case, where the court did say, no, you didn't meet your burden. The prison came in and said, look, this is how we handle mail. This is where the prisoner was when he filed this. And they completely contradict the testimony. But here, there's no other evidence in the record. So if you say that a prisoner's testimony is never enough because it vitiates the mailbox rule, then it's basically saying a prisoner's affidavit and testimony isn't evidence. Well, the case you decided, of course, there was cooperation by one other person. There was no corroboration here. That's true. But the conditions of this confinement, a person in his condition could never have cooperation. He was in a cell alone in administrative segregation. The correctional officer came by in the evening to pick up the mail. He gave the correctional officer his mail. He doesn't have any corroborating evidence. He was then moved four times, and he doesn't even have paperwork showing that he was in segregation. So in this case, you're right, there is no other corroborating evidence, but also the government put on no contradictory evidence. It's the only evidence that was in front of the magistrate. Could I ask you to turn to the equitable tolling? That's based on, as I understand it, access to the library? It's based on several factors. The circumstances that were outside Clark Agner's control during this time while he was in administrative segregation and being moved around, and he was in administrative segregation because of his gang status, and when they moved him to new prisons, I guess as a matter of course, they keep prisoners segregated. Eventually, he, unaffiliated from the gang, was allowed to go to a regular prison, and that's when things improved and got access to the library. But he had, he was, just the fact of being in administrative segregation was somewhat limiting on him because he didn't have access to the main library. Because they were moving him so much, he didn't have access to his own files. And he also, the number of times he was transferred is pretty extraordinary compared to some of the other cases where this court has found that a transfer is in fact an extraordinary circumstance that's outside the prisoner's control. He was moved multiple times. And within the institutions that he went to, he was moved in and out of administrative segregation as well. So he had even less access to his files than the petitioners did in, I'm going to forget the name of the case, in Lott, where there was an AT&T transfer when the prisoner went back. When did he first get access to a law library? He first got access to a law library in 2004. Of August of 2004, he was sent to Atlanta. He was kept in administrative segregation for three months. So in approximately late October or early November of 2004, he was in the main population in Atlanta. And prior to that time, he never got into any law library? No, he says he had access at one facility to the library that was made available to prisoners that were in the hole and that it was completely inadequate, had about 30 books in it and didn't have one. That's what I read. So it only has 30 books? Well, and he did, in fact, while he was in segregation, attempt to file a petition. We don't know what it said. He says it raises the same claims as the second one, except for the additional of the Blakely claim, which has been dismissed by the district court before he went to the magistrate. But yes, he had limited access to some law library materials. Okay. You see, but my recollection of the cases that say non-access to a library might be a impediment or some cause for tolling were in the context of, like for instance, when the EDFA was newly enacted, so people didn't know what the law was, so they had to have access to the new statute. But there's no showing here that there's any particular reason why he couldn't prepare his petition without access to a library, is there? Well, he says his statutory period arguably began on August 17, 2002. That's 10 days after he was sentenced. At that time, he was held in a pretrial facility, a state pretrial facility here in Anchorage. My question is, what's showing you here that he needed access to a law library in order to file a petition? Well, without access to a law library, it is undisputed that his defense counsel below did not tell him about his habeas rights. So without access to a library or access to a facility where there was prison law librarians or any other information, he didn't even know about the existence of the statute. So it wasn't until he got out of the pretrial facility in Anchorage. So you don't think it's common knowledge in the prison as to how much time he had? He wasn't in the general prison population for quite some time. It should be especially common knowledge in the whole state. He was in administrative segregation. He had no cellmate. So in the first three months of his incarceration, he was in a state pretrial facility. He was then moved to administrative segregation in West Virginia, and he was held there for a while. And then he was moved to Atwater, and that's the first time he found out about it. That was in April of 2003, and he attempted to file from administrative segregation in June of 2003. That was his first attempt to file. Okay. Do you want to save the rest of your time for rebuttal? Thank you. May it please the Court, my name is Joanne Farrington, and I represent the government in this case. Let me address first the question about the access to the law library that was just raised. I actually think that's a little bit of a red herring in this case, but I would direct you to the Exeter Record 2109, which is Mr. Clark Agnew's testimony about his access to law libraries. He's testifying on that page about conditions at Atwater, where he claimed he drafted his first 2255, which he claimed he filed in June of 2003. In Atwater, he testified that he was in segregation part of the time, but with respect to the law library, he said he had access to a, quote, good law library. He got advice from other inmates and a, quote, law library guide, and he was able to prepare and file a 2255. Now, he doesn't know what happened to that 2255, but he says he prepared it. He also, on page 2111 in the Exeter Records, testified that even when he was in segregation, he did have access to a law library, although he complained about its quality. But, in fact, I think that all that is, as I said, a bit of a red herring, because since he claimed that he was able to draft and hand a petition that amounted to a 2255 to a prison official in June of 2003, his access to a law library after that point is largely irrelevant. The burden on him to show that he was reasonably diligent in following up on that petition would only be a matter of contacting the court. All he would have had to do was write a letter. Writing a letter, making a phone call, that does not take access to a law library, and takes very few resources and almost no time. Even the fact that he was in segregation for a substantial period of the time after that, until he finally landed in Atlanta, where he was in the general prison population, wouldn't have significantly interfered with his ability to follow up on the petition he claimed he had filed back in June of 2003. What about the fact that he was moved from prison to prison to prison? And how do you respond to the case of Houston v. Lack? Being moved from prison to prison would, theoretically, have interfered with his ability to, in a coherent fashion, sit down and research and then write up his 2255. But his testimony was that he had already done that. They did that back in June of 2003. He eventually prepared another 2255, but he never made any effort in the two years after the statute of limitations ran to follow up on that purported petition. He never contacted the court in any way. He never made a phone call. He never wrote a letter. He doesn't even claim he did those things. The case of Houston v. Lack is the prison mailbox rule. We're talking about pro se prisoners necessarily lose control and contact with other people when they're moved from prison to prison. Yes, that's absolutely true. And that's the reason why we give prisoners the benefit of the doubt with respect to procedural niceties and with respect to the adequacy of their pleadings. But the question here is, was he telling the truth when he claimed that in June of 2003 he filed a 2255? Well, but the magistrate judge in his report and recommendation really doesn't question the petitioner's credibility, does he? And he doesn't make a finding that he wasn't credible. He doesn't explicitly say in his recommendation that he finds the prisoner's testimony not credible. He just recites his testimony and then draws a conclusion. But he concludes that there was no 2255 handed to a prison guard in June of 2003. But he seems to take the petitioner's testimony at face value, is what I'm saying. I don't... And you seem to be relying on the fact that he was not credible. I don't believe that you can read his conclusion and come and believe that the magistrate judge was accepting his testimony as credible because he testified that he had, in fact, handed this document to a prison guard. So how do we review the magistrate judge's rationale for rejecting it if he doesn't make an average credibility finding? Well, I think necessarily his conclusion that there was no document is based on a lack of credibility. Based on what? Just because he decided he doesn't believe him? Oh, no, no. There's a great deal in the record that supports his conclusion. First, he says that Clark Agnew's testimony is vague and unsubstantiated, virtually no detail. In terms of dates, he doesn't give the names of any of the people that he was allegedly dealing with. But the most telling piece of evidence that the magistrate judge relied on, I think, is in the 2005 2255 that was filed, which you can find at page 249. That's Clark Agnew's affirmative statement in that 2255 that he made no previous filings with respect to his case. I think even more telling is his answer to question 18 on page 2-59. No, no, you see, but I realize that's in the record, but then the magistrate judge doesn't say, you know, because of these contradictory statements, I don't believe him when he said he filed the earlier petition. He doesn't say that, does he? No, but he points out the fact that Clark Agnew had previously said that he had made no such filing. I think what you're saying is, I don't know whether we can do it in this context, maybe we can, but that implicitly the magistrate judge concluded that the petitioner was not credible. That's true. It is implicit in his conclusion that there was no document. He had to have been finding Clark Agnew not credible. And he did also, I'd like to point out, specifically find his testimony not credible on two specific points, with respect to his not knowing the address to contact the court and with respect to his having no access to a law library. The fact that he explicitly found him not credible on two specific points, I think the magistrate judge was perfectly within his rights to take that into account in assessing his testimony as a whole. Well, what troubles me, Judge Nelson raised this at the beginning of the argument, is this statement of the magistrate judge that says the defendant has not offered any evidence from the institutions of his confinement to substantiate his claim of earlier filing a habeas petition. What burden are we placing on prisoners then who are in his kind of isolated circumstances and getting moved around a lot to substantiate, we're not talking about due diligence, we're talking about evidence to corroborate that they put it into the prison system. What more are they supposed to do? Where does that requirement come from? Well, I think that Weiser v. Carey gives some guidance on that point, and in fact it's the due diligence itself that then proves or then can be relied upon by the petitioner to demonstrate that in fact he did hand over such a document to the prison. Yeah, but that's not what the magistrate judge is doing. He's going into due diligence on the equitable tolling. He says, well, maybe I'm misreading it, he said, well, I take it, I see, he does go on and say it, yeah. The Clark-Eiger's failure to follow up in any way for two years after he purportedly filed this petition was used by the magistrate judge in two ways. One, he said, if he attempted to file such a document, one would expect that he would have taken some steps to check up on it at some point in the ensuing months and years. He then went on to say that even if there was such a document handed to the prison guards, the burden is then on the petitioner to exercise due diligence to follow up on that petition in order to get the benefits of equitable tolling. In this case, again, Clark-Eiger did nothing for two years. Under circumstances where, frankly, the burden on him would have been very slight. We're not talking about very much. Writing a letter, making a telephone call, asking his mother to write a letter would not have taken much time, much effort, and it certainly wouldn't have taken any legal expertise. Finally, I would like to note, just as a factual matter, that while Clark-Eiger's initial drafting of his 2255 was pro se, he was represented by counsel at the evidentiary hearing, able counsel, and he had every opportunity at that point to correct any deficiencies in his initial filings and in the proof that he offered to the court. My time has just run out. Do you have any other questions? No, thank you. The magistrate did not make a factual finding about Clark-Eiger's credibility. He made a legal determination about sufficiency of the evidence, and he based that legal determination on his bright-line rule interpretation of Evans that said, if you wait more than six months to contact the court, you are de facto not diligent. That's not what Evans said, first of all, and it was not a factual determination. So I think that the magistrate's reliance on the other facts, he fabricated evidence in light of the fact that the government didn't offer any. He said, basically, prisons usually allow prisoners foreign segregation access. That's why he rejected his testimony. And then he said Clark-Eiger appeared at the courthouse during the criminal proceedings, so therefore he knew the address while he was in administrative segregation without his files. Well, I'm looking at Huizar, and there are troublesome aspects to this back-and-forth of how much burden we put on the parties, on the prisoners. But we said that Huizar was reasonably diligent, having received no response from the court two months after he sent his petition he wrote to the court. He then, as you pointed out, said he waited an additional 21 months after that, which is not an unusually long time. But then there were a flurry of efforts on his part to follow up. Now, I take it your argument is, aside from the fact that your client didn't do anything for 24 months, and then what he did do instead of sending a letter, he filed a petition. And in that petition he says, I haven't filed anything before, but I'm having a little trouble analogizing to your client's situation when he didn't at least try to send a letter or do something within the 24 months. Huizar at least made some effort shortly after he sent it in, and your client didn't do anything. And it's not inconsistent with having not filed something to do what he did, which is to file, check the box, and say, I haven't filed anything before. He rectified that a week later and explained it more fully. But in Huizar, there's no evidence, first of all, that that petitioner was in any way moving around or had any trouble with the constancy of access to records and not being moved and all that. But the court says very clearly it's not a question of access to records. It's a question of whether he can communicate. Well, he didn't even have the address of the court, which the court says he should have had it memorized because he appeared here once. So it is somewhat a question of access. What address does he need? He was in court. He was convicted. He just didn't, you know, send it. He could have sent it to, you know, U.S. District Court, or Appalachian County District Court, or any court. Any court will get it. That's all you need, right? Well, he needs street address. In a prison? He doesn't need a street address. He just needs the name of the court. That's all you need to address it to a court. Well, that's not in the record. I wasn't aware you could get it delivered without a street address. Well, I was just a judge. I used to get, you know, letters addressed to me from U.S. District Court in California. If I could, I'm completely out of time, but I want to answer your question about bizarre. In that case, the court said very clearly that a petitioner, a criminal, an incarcerated person is not going to realize that 21 months is too long to wait, and I don't think that 24 months is a stretch. Okay. Got it. All right. Thank you, counsel. I appreciate the argument and the cases submitted. That takes us to the next case on calendar, Oscar v. Alaska Department of Education, Early Development.
judges: Nelson, Tashima, Fisher